# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re | : Chapter 13 |
| | : |
| NICHOLAS VERRATTI | : |
| | : Bankruptcy No. 12-20468 SR |
| DEBTOR | : |
| _____ | : |
| NICHOLAS VERRATTI | : |
| PLAINTIFF | : |
| v. | : |
| | : |
| PNC BANK | : |
| DEFENDANT | : Adv. No. 13-00148 |
| _____ | : |

# OPINION

By: Stephen Raslavich, United States Bankruptcy Judge

*Introduction*

The Debtor has filed an adversary proceeding seeking a declaration that the

Defendant's second mortgage lien is void. PNC Bank, the holder of the second

mortgage lien, opposes the relief. A hearing was held on August 12, 2014, after which

the Court took the matter under advisement. For the reasons discussed herein, the

Court finds the value of the Debtor's real property to have been not more than $125,000

on May 24, 2013. The effect of that finding will permit the Debtor to avoid the second

lien under his Chapter 13 plan.[1]

---

[1] Because this adversary proceeding involves the determination of the validity, extent or priority of
a lien, it is within this Court's "core" jurisdiction. *See* 28 U.S.C. § 157(b)(2)(K).

*The Property,*
*Liens and Claims*

The following is established: the Debtor's home is located at 442 Hillside Road in the Borough of Ridley Park, Delaware County, Pennsylvania (the Property). The surrounding area is suburban with single family residential homes. The Property is situated on a public road. The site in question is an irregularly shaped lot consisting of 0.34 acres and is improved with a single-story detached ranch style structure with a brick exterior. The residence is approximately 62 years old. The Debtor purchased it in 2001. The home has a built-in one-car garage, three bedrooms, one bath and gross living space of approximately 1300 square feet. Access to the home is gained via a macadam driveway.

The Property is encumbered by two mortgages both of which are held by PNC Bank. The first mortgage debt is in the amount of approximately $135,000 and the second in the amount of $103,000. In his Schedules the Debtor valued the Property at $125,000. The Amended Complaint herein avers the same value. In its Proof of Claim for the *first* mortgage, the Bank also valued the Property at $125,000. In its Proof of Claim for the *second* mortgage—filed four months later—the Bank valued the Property at $158,000. In its Answer to the Complaint, the Bank contended that the value of the Property was $205,000. Response, ¶12.

*Section 1322*

Under the Debtor's Amended Chapter 13 Plan, the Debtor proposes to keep the Property and make no payment on the Bank's second mortgage. *See* Plan. To do that, the Debtor seeks to void (i.e., "strip off") the lien in its entirety. Because the second lien

2

encumbers the Debtor's principal residence, the Debtor's right to treat the lien in that

way is not unqualified. Section 1322 of that Bankruptcy Code provides, in pertinent part:

> Subject to subsections (a) and (c)[2] of this section, the plan
> may—
> …
> **(2)** *modify the rights of holders of secured claims*, other than
> a claim secured only by a security interest in real property
> that is the *debtor's principal residence*, or of holders of
> unsecured claims, or leave unaffected the rights of holders
> of any class of claims;

11 U.S.C. § 1322(b)(2) (emphasis added). Thus, to the extent that there exists any

value which would secure some or all of the second mortgage debt, the second lien

may not be modified. If, on the other hand, there is no excess equity beyond the amount

due on the first mortgage, then the lien may be modified. *See In re McDonald*, 205 F.3d

606, 615 (3d Cir. 2000) (holding that a wholly unsecured mortgage is not subject to the

anti-modification clause in § 1322(b)(2)). To determine whether the second lien is wholly

unsecured the Court must accordingly undertake a valuation of the Property.

*Section 506*

Valuation of secured claims is provided for in the Bankruptcy Code:

> An allowed claim of a creditor secured by a lien on property
> in which the estate has an interest, or that is subject to setoff
> under section 553 of this title, is a *secured claim to the
> extent of the value* of such creditor's interest in the estate's
> interest in such property, or to the extent of the amount
> subject to setoff, as the case may be, and is an unsecured
> claim to the extent that the value of such creditor's interest or
> the amount so subject to setoff is less than the amount of
> such allowed claim. Such value shall be determined in light

---

[2] Neither of these two subsections applies to the instant transaction. In particular as to subsection (c), the Debtor is not proposing to cure the arrears; neither does the loan have fewer than 60 payments left on its term.

> of the purpose of the valuation and of the proposed
> disposition or use of such property, and in conjunction with
> any hearing on such disposition or use or on a plan affecting
> such creditor's interest.

11 U.S.C. § 506(a). The Amended Complaint requests such a determination as it is

necessary if the Debtor is to confirm the Plan. *See* B.R. 7001(defining among adversary

proceedings (2) a proceeding to determine the validity, priority, or extent of a lien in

property)

*Purpose of*
*The Valuation*

The Court cannot determine the value of the Property without first considering

what the Debtor intends to do with it. In this regard, the Plan proposes the Debtor's

continued ownership of the Property as his home. In circumstances where the Debtor

intends to retain and use a secured party's collateral, case law instructs that the

valuation method will normally take the form of a hypothetical purchase by the Debtor of

the asset in question on the date as of which the value of the asset is found. In this

instance two competing experts opined on value. Their conclusions purport to be based

on arms-length sale transaction data for comparable properties within a time frame

proximate to the Debtor's bankruptcy filing. *See Associates Commercial Corp. v. Rash*,

520 U.S. 953, 965 n.6, 117 S.Ct. 1879, 1886 n. 6, 138 L.Ed.2d 148, 60 n.6, C.B.C.2d

744, 751 n.6 (1997).

*Timing*

Neither party has raised the issue of the date of valuation. This matters given that

the bankruptcy case was filed over two years ago. Accordingly, the Court is guided by

4

the Third Circuit's opinion in *In re McDonald*, *supra*. There, the Third Circuit observed

there is no clear consensus in the case law as to the particular date which should

control for valuation purposes. The Court did not resolve the timing question, although it

noted 1) that § 506(a) states that value shall be determined in light of the purpose of the

valuation and of the proposed disposition or use of the property in question, and in

conjunction with any hearing on such disposition or use or on a plan affecting the

subject creditor's interest in same, and 2) that whatever rule is adopted it is desirable to

avoid allowing an appeal to delay the date used for valuation so as to discourage a

party from bringing an appeal in the hope of obtaining a more favorable evaluation.  205

F.3d at 615.  Considering 1) that the Debtor's plan is not yet confirmed, 2) that a hearing

on this matter has been continued numerous times, and 3) that there is no evidence that

real estate values in the relevant market have changed significantly in the last two

years,[3] the Court concludes that the date of the valuation will be based on the later of

the two appraisals. In this regard, the Debtor's appraisal is as of August 9, 2012 and the

Bank's is as of May 24, 2013.

*Burden of Proof*

        The Court is guided here by the Third Circuit's holding in *In re Heritage Highgate,*

*Inc.*, 679 F.3d 132 (3d Cir. 2012). There, the Court of Appeals adopted a burden-shifting

approach in the context of § 506(a) valuations. The initial burden is on the party

challenging a secured claim's value because § 502(a) grants prima facie effect to the

validity and amount of a properly filed claim. If the debtor establishes with sufficient

---

[3] Indeed, both experts testified that home values have been "stable." T-22, 41

evidence that the proof of claim overvalues a creditor's secured claim because the collateral is of insufficient value, the burden then shifts to the creditor. Thereafter, the creditor bears the ultimate burden of persuasion to demonstrate, by a preponderance of the evidence, both the extent of its lien and the value of the collateral securing its claims. *Id.*, 679 F.3d at 139-140.

*Second Mortgage Claim*

On March 27, 2013, the Bank filed a Proof of Claim based on the second mortgage. The amount of the claim is $102,738.44; the value of the Property securing the claim is alleged therein to be $158,000. That claim is deemed an allowed claim until challenged by the Debtor. See 11 U.S.C. § 502(a). The Debtor's Amended Complaint joins the issue of whether the Bank's second mortgage claim is secured at all.

*Debtor's Appraisal*

Both parties offered expert appraisal testimony for and against the claim of secured value.[4] The Court begins with the Debtor's appraiser, Joseph Ballasy. He values the Property at $125,000 as of August 9, 2012. At the outset, the Court highlights two points about the Debtor's appraisal which makes it especially probative: first, the comparable sales used are of the same style as the Debtor's house and second, they are all located in the same borough as the Debtor's house. The Debtor's house is a ranch-style dwelling and the Debtor's appraiser used only sales of ranch–style homes to

---

[4] Each appraiser prepared a written report which was received into evidence. Both expert reports utilize the same method; that is, the subject property is compared to sales of similar homes in the area. The background of each sale is set forth and from there the appraiser identifies distinguishing characteristics between a subject property and purported comparable sales.

arrive at his value. T-16. Likewise, the Debtor's home is located in the Borough of

Ridley Park. Similarly, his appraiser used properties in that borough. *Id.* Mr. Ballasy's

choice of similarly styled and closely located comparable sales increases the probative

weight of his conclusions. *See In re Moore*, 2012 WL 2870710, at *3 (Bkrtcy.N.D.Ga.

May 15, 2012) (finding that a dwelling of one and one-half floor not as comparable to a

ranch-style dwelling); *In re Stealy*, 2006 WL 2792224, at *3 (Bkrtcy.N.D.Ohio, Sept. 26,

2006) ("The best comps are those in the closest proximity with the closest sale date.");

*see also In re Melgar Enterprises, Inc.*, 151 B.R. 34, 37 (Bkrtcy E.D.N.Y. 1993)

(rejecting appraisal which did not examine properties within the vicinity of the subject

property); *In re Thompson*, 18 B.R 67, 70 (Bkrtcy.E.D.Tenn. 1982) ("It is generally

recognized that comparable sales in the vicinity of the subject property produce the best

guides to determine fair market value)

*Debtor's Appraiser*
*on Condition*

Having chosen a comparable data set based on style and location, the Debtor's

appraiser next opined on the condition of the Property. T-17 The Debtor's appraiser

describes the condition along a six grade scale with 1 being the highest grade of

"superior" and 6 being the lowest grade of "poor." *Id.* Mr. Ballasy considered the

Property to be in "fair" condition.  T-18. "Fair" would be considered a "4" on the six grade

scale. *Id.* He based that opinion on his observation of the following: the interior required

painting and he emphasized that fact; the floors were in need of refinishing; the ceiling

has tape marks where the roof has leaked; the gutters were loose having separated

from the side of the house; there was rotted exterior wood and paint peeling around

windows; and the toilet in the half-basement was not functional. T-18-19, 29.  Within his

report on condition, Mr. Ballasy found the that the sun room door was difficult to open;

that the basement door was leaking and has allowed insect infestation; that the kitchen

cabinets showed signs of wear on their surfaces; and that some of the windows in the

family room were cracked. *See* Debtor's Appraisal, 3. In general, he noted that in

comparison to other homes in the immediate area, as well as the comparable sales

used, the condition of the Debtor's home was not as well maintained; therefore, he

assessed it as "fair." T-19. In other words, it was below average. T-21. Based on his

opinion as to condition, he adjusted each of his comparable sales downward by $10,000

to reflect the condition of the Debtor's property. *Id.*

*Debtor's Appraiser's*
*Other Adjustments*

The Debtor's appraiser also made downward adjustments based on seller

concessions, the room count, the patio, and the age of the kitchen. Seller concessions

reduced comparable sale #1 ($3000) and #2 ($7400) but not #3 which was a short sale.

The Debtor has but one bathroom while two of the comparable properties have 1.5 to 2

baths and so a $2500 reduction was made as to the first comparable sale and a $5000

deduction was made to the third. As to outdoor living space, the appraiser noted that the

comparable sales had either a patio/sunroom, a screened deck or a porch. The Debtor's

home is listed as having only a patio.[5] He thus made downward adjustments of $3000,

$2500 and $1000 respectively. As to the kitchen, two of the comparable sales had

updated modern kitchens and so the Debtor's kitchen was adjusted downward by $5000

---

[5] That, too, is undetermined because the Bank's appraisal lists "NONE" next to "PATIO."

and $2500.

All of the adjustments were not negative. The size of the Debtor's lot was larger than the comparables and so it was adjusted upward ($1500, $1000 and $1000). Similarly, none of the comparables had garages and so an across the board $2500 upward adjustment was made to the subject property. In the case of the basements, no two were the same: the Debtor's basement was partial and unfinished; the first comparable had no basement, the second had a full, finished basement with a powder room, and the third was full but unfinished. Thus, the Debtor received an upward adjustment of $10,000 for the comparable without a basement but a $6500 reduction for the second and $1500 reduction for the third.

Taking all of the factors together, Mr. Ballasy reached a negative net adjustment for all three comparable sales but in varying amounts. With all but one of his adjustments, the Court finds no fault. Only the inclusion of a patio, which would only serve to lower value, is questionable; the photographs of the subject property do not reveal a patio and the Bank's appraisal reports that no patio exists. Other than that, the appraised value of $125,000 is supported by the evidence.

*Relevance of*
*First Mortgage Claim*

That alone would shift the burden back to the Bank to prove a different value; however, Debtor sought to offer more evidence on that score. He also offered at trial the Proof of Claim filed as to the *first* mortgage. That claim was filed roughly 4 months before the claim for the second mortgage was filed. The claim for the first mortgage debt values the Property at $125,000.  That is inconsistent with the Bank's second

mortgage Proof of Claim, filed only four months later, which values the Property at $158,000. The Debtor sought to enter the first mortgage claim into evidence, but the Bank objected. The Bank argued that the Proofs of Claims were not valuation determinations and thus had no probative weight. T-33. The Debtor argued that the claim was entitled to some weight. *Id.* The Court allowed the claims into evidence leaving for later the determination of the weight to accord to them.

Upon consideration, the Court observes two points. On the one hand, the claims are not wholly without probative value. In a space of four months, a creditor has given significantly divergent opinions as to the value of the same piece of collateral. On the other hand, the Proofs of Claim were filed in a context different from valuation. Proofs of claims are filed in order to be *allowed* against the estate; valuation determinations are undertaken to determine the extent of collateral. *See* 11 U.S.C. § 502(a) and § 506(a). *See In re Fareed*, 262 B.R. 761, 765 (Bkrtcy.N.D.Ill. 2001) (explaining that claims allowance process initiated by proof of claim deals only with total amount of creditors claim and does not involved collateral valuation or determination of claims secured or unsecured status); *see also In re Slovak*, 489 B.R. 824, 827 (Bkrtcy.D.Minn. 2013) ("the Court does not consider the creditor's proof of claim as direct evidence of value because the purpose of a property valuation under section 506(a) is different from the creditor's purpose in filing the proofs of claim) The claims constitute, at most, an admission against interest. *See* F.R.E 801(d)(2) (made applicable by B.R. 9017). The significance of what is in the claims will matter more if, after consideration of the evidence offered by each expert, the decision is a relatively close call. The Court thus turns to the opinion of the Bank's valuation expert.

*Bank's Appraisal*

The Bank's appraiser was Charles Huhn. Mr. Huhn values the Property at

$155,000 as of May 24, 2013. Beginning with the same two factors that the Court found

to be significant in the Debtor's appraisal; to wit, the style of the comparable sales and

their location, the Court observes a basic difference between the two appraisals. Mr.

Huhn's report does not use ranch homes for comparison. Instead, he relies on Cape-

Cod type dwellings. At trial, he stated that he could not find any ranch-style homes,

notwithstanding that the Debtor's appraiser did. T-36. The Court considers such a style

to be less comparable than the ranch style. The differences are not insignificant. As a

ranch-style home, the Debtor's dwelling is limited to a single floor; a Cape-Cod structure

has one and one-half floors. Mr. Huhn even testified to that fact. T-45. The Court also

observes that none of the Bank's comparable sales are located in Ridley Park Borough.

While the Court observes that as a matter of distance, the Bank's comparable sales are

not much further removed from the Debtor's home than are the Debtor's comparables,

they are still outside the same municipality. So in terms of both style and location, the

Bank's comparable sales are less probative than those offered by the Debtor.

*Bank's Appraiser*
*On Condition*

Focusing on the subject property itself, the appraisers disagree on its general

condition. The Bank's appraiser did not agree that the Property was in "fair" condition.

Mr. Huhn considers the condition to be at worst "slightly below average." T-36. In

specific, he considers the interior of the Property to be in "average" condition. T-40. His

testimony, however, offered few specifics as to why that was so. For the most part, Mr.

11

Huhn believed that the defects identified by the Debtor's appraiser were cosmetic at most. *Id.* For example, as to the condition of the paint, Mr. Huhn did not agree that repainting was required. T-38. He noted a damaged downspout but stated it could be repaired. He conceded that the basement door was leaking and so should be repaired. *Id.* He opined generally that overall the house was in average condition. Whereas the Debtor's appraiser pointed to specific items in clear need of attention, the Bank's appraisal took a somewhat holistic view. As a result, <u>no</u> adjustments to comparable sales were made based on condition.

*Bank's Appraiser's*
*Adjustments*

Elsewhere in the Bank's appraisal, generally fewer adjustments to the comparable sales were made. The adjustments made dealt with sales concessions, room count, basement, patio, and a fireplace. The sales concessions applied to each comparable were $8900, $7763, and $5000, respectively. As to baths, the first two comparables have 2 baths and so a downward adjustment of $3000 was made. As to gross living area, the second and third comparables have more square footage and so deductions of $3000 and $2000 were made. As to outdoor living, all three comparables have either a patio, a porch, or an enclosed porch/patio while the Debtor's home is reported to have none. Downward adjustments were made for that reason: $1000, $1000 and $3000. On the plus side, one of the comparables had no garage and two of them lacked a fireplace which resulted in upward adjustments.

*Weight of Evidence*

In weighing the evidence, the Court finds that the decision is not a particularly close call.  The Court rejects the Bank's appraiser's rationale for choosing Cape-Cod style homes over ranchers for his comparable sales. Mr. Huhn stated that there was a dearth of suitable ranchers available. T-36.  He rejected the ranchers the Debtor's appraiser chose because they were not in similar condition. T-37. The Court is unpersuaded by this. Similar condition is not a prerequisite for a comparison. In fact, the URAR form contemplates differences in condition. That is why there is a line item for condition on the form.  The appraiser may make numerous adjustments to a comparable property based on the condition of the subject property. Indeed, that is what the Debtor's appraiser did here: all of the comparables were in better condition than the Debtor's home. As a result, Mr. Ballasy adjusted them downward. There was no need for the Bank's appraiser to rely only on ranch-style dwellings as comparable sales, and his decision to do so detracted from the probative weight of his valuation.

As to condition, the Debtor's appraiser offered considerably more evidence in support of his opinion.  His conclusions were based on observation of discrete and specific deficiencies which adversely affect property condition. His conclusions in this regard are corroborated in the photographs attached to his appraisal.

In contrast, the Bank's opinion that the Property is in average condition is not as well supported by evidence. It is worth noting that while the Bank's appraiser used the term "average" in his testimony at the hearing, his appraisal uses the specific designation "C4" instead of the word "average." The grade "C4" comes from the Freddie Mac and Fannie Mae condition rating standards for documenting the condition of a

13

dwelling during an appraisal process. "C4" is defined as

> [s]ome minor deferred maintenance, physical deterioration
> due to normal wear and tear. The dwelling has been
> adequately maintained and requires only minimal repairs to
> building components and mechanical systems and cosmetic
> repairs. All major building components have been
> adequately maintained and are functionally adequate

*Fannie Mae Selling Guide, B4-1.3-06: Property Condition and Quality of the*

*Construction of the Improvements* (4/15/2014) available at

www.fanniemae.com/content/guide/selling/b4 (listing six levels of condition grading for

appraisers); *see also Latham v. Latham*, 2013 WL 2350754, at *4 (Conn.Super. May 18,

2013) (explaining the "C4" designation in appraisal report means that the home is

adequately maintained and needs only minimal repairs)

By this yardstick, the Bank's evidence does not support a finding of average

condition. The only specific testimony that Mr. Huhn offered as to the condition needing

no more than cosmetic fixes was with regard to paint.  He maintained that all that the

walls needed was an application of paint. Other than that, he did not dispute any of the

specific shortcomings identified by the Debtor's appraiser. In fact, he even conceded

shortcomings not commented upon by the Debtor's appraiser; to wit, that the basement

door and sewer pipes were leaking. *See* Bank's Appraisal, Supp. REO Appraisal

Addendum. Such evidence certainly does not support a finding that the Property suffers

from nothing more than minor deferred maintenance, or wear and tear. To the contrary,

it has not been adequately maintained. In fact, the evidence demonstrates a significant

degree of neglect. For that reason the Court finds the Property to be at best *below*

average, or "fair," as the Debtor's appraiser puts it.

*Summary*

As between the two appraisals, the evidence weighs heavily in favor of the Debtor's expert's estimation of value. His comparable sales are a better gauge of what a willing, arms-length buyer would pay for the Property. His opinion of the Property's condition is amply supported by evidence and the Court therefore finds that the value of the Property was not more than $125,000 as of May 24, 2013. [6] As a consequence, the Bank's second mortgage lien is wholly unsecured and will be declared void.

An appropriate Order follows

By the Court:

_____
STEPHEN RASLAVICH,
United States Bankruptcy Judge

Dated: September 19, 2014

---

[6] This conclusion makes it unnecessary to further discuss the import of the Bank's Proof of Claim.